Thomas **DOWNIE**

v.

**UNITED STATES LINES COMPANY.**

**No. 27 of 1960.**

United States District Court
E. D. Pennsylvania.

June 25, 1964.

Marvin I. Barish, Philadelphia, Pa., for libellant.

Rowle & Henderson, Thomas F. Mount, Philadelphia, Pa., for respondent.

KRAFT, District Judge.

This action in admiralty for maintenance only is before us on the record made at the trial of Civil Action No. 27626, 231 F.Supp. 192, in which the present libellant recovered a verdict and judgment under the Jones Act.

From the evidence, we make the following

## FINDINGS OF FACT

1. On November 5, 1958, libellant was employed as an electrician aboard the S.S. American Builder, a vessel owned and operated by the respondent, and then docked in the Port of London.

2. At about 2 o'clock that morning, while he was asleep in his bunk, libellant suffered a heart attack in the nature of a myocardial infarct caused by an occlusion or stoppage in the coronary arteries.

3. As a result of his heart attack, libellant was confined in the Dreadnought Hospital, London, for three weeks. He was then returned to the United States and was an inpatient at the Staten Island Marine Hospital for nine days. Thereafter, libellant received medical treatment at the Baltimore Marine Hospital as an outpatient until April 28, 1959, when his myocardial infarct was healed and libellant indicated he felt ready to return to work. He was determined to be fit for duty, but told to return in one month "if in town". (Libellant's Exhibit P-10).

4. On May 28, 1959, libellant returned to the Baltimore Marine Hospital for a check-up, and indicated that he had applied for a job. This re-examination again disclosed that his myocardial infarct was healed and that he was fit for duty. (Libellant's Exhibit P-10).

5. Libellant has received no medical attention since about January 1961, when his family doctor gave him a physical examination, including a cardiogram, and medication in the form of pills.

6. Libellant has received maintenance up to April 29, 1959, inclusive.

7. Libellant achieved the maximum cure possible on May 28, 1959, when, for the second time, he was discharged from the Baltimore Marine Hospital as fit for duty.

8. The parties have stipulated a rate of $8 daily for any maintenance due.

## DISCUSSION

Whatever may have been the rule in former times, it is now settled that the duty of a shipowner to furnish maintenance and cure does not extend beyond the time when the maximum cure possible has been effected. The question was set at rest in Farrell v. United States, 336 U.S. 511, 69 S.Ct. 707, 93 L.Ed. 850 (1949). In that case, the Court, speaking of the Geneva draft convention adopt-

ed in 1939, stated (336 U.S. p. 518, 69 S.Ct. p. 711):

"That the duty of the ship to maintain and care for the seaman after the end of the voyage only until he was so far cured as possible, seems to have been the doctrine of the American admiralty courts prior to the adoption of the Convention by Congress, despite occasional ambiguity of language or reservation as to possible situations not before the court. It has been the rule of admiralty courts since the Convention."

██ We are persuaded by the evidence that libellant attained the maximum cure possible on May 28, 1959, when for the second time he was discharged as fit for duty. The hospital records which he offered in evidence, show that his myocardial infarct was healed a month before and that this finding was reiterated on May 28. The date on which the seaman is certified as fit for duty, while not conclusive, is a factor in ascertaining the time at which maximum cure has been effected. Carleno v. Marine Transport Lines, Inc., 209 F. Supp. 859, 865 (E.D.Va.1962). Moreover, libellant's testimony indicates that the physicians at the Baltimore Marine Hospital considered libellant cured so far as possible:

"I went back there I believe two or three times from April to September and I told them I was still having this trouble with my arm and chest, and the doctor said, 'Well, all you can do is take your nitroglycerine or demarol and lay down, and keep your feet higher than your head when your ankles swell.' "

Libellant now places great reliance on the testimony of Dr. Soloff, respondent's medical witness, given on direct examination:

"Q Do you think that the symptoms he complains of now could be alleviated or corrected by medical treatment?

"A Well, we *hope* so. This man has not had any treatment at all, apparently hasn't seen a doctor except for this episode at Jefferson, and *if* his symptoms are on the basis of heart disease, I certainly would myself like to have the opportunity of treating him, or some other doctor should. I think he could be helped *if* this is due to his heart, yes." (Emphasis supplied)

Dr. Soloff's hope must be interpreted in the conditional context of his entire testimony. He examined libellant on March 5, 1963, and again in the following October. From his examination of libellant, the hospital records and the history given him, Dr. Soloff concluded that libellant had an infarction on November 5, 1958. However, it is clear that Dr. Soloff was of opinion that libellant's symptoms and complaints, at the time of the examinations, were *not* referable to heart disease. In a report to respondent's counsel dated March 9, 1963, Dr. Soloff stated:

"The only disturbing feature about the examination was the swelling of the legs. It did not appear to me that this swelling was actually on the basis of heart disease because I could find no other evidence for heart failure. I would be inclined to believe that they are of local obstructive origin. Knowing now that he had no pulses in the lower extremities at the time of his initial examination after his heart attack, it would be my opinion that probably there is some disease long antedating the heart attack and unrelated to the heart attack which is producing the swelling of the legs."

Gibson v. United States, 100 F.Supp. 954 (E.D.Pa.1951), relied on by libellant, is readily distinguishable. In that case, libellant was under the care of a heart specialist up until the time of trial. His treatment consisted of sedatives and other medication designed to relieve him of chest pains and other discomforts, and as a result of this medication his pains were reduced in number and intensity

(Findings of Fact 5 and 6). The Court held, in these circumstances, that the treatment was "curative". The present libellant, on the other hand, has not sought medical aid since he was examined by his family physician in about January 1961. There was no showing that his own doctor advised medical treatment, curative or other.

■ We have reviewed all the "heart" cases cited in libellant's brief, but find them inapposite. As the Court pointed out in Gibson, supra, "It is axiomatic that 'the limits of cure or care, both as to kind of treatment and time of continuance, must always depend on the facts of each particular case.'"

We find, accordingly, that libellant is entitled to maintenance from April 29, 1959, to May 28, 1959, a period of 29 days at $8 per day, a total of $232.

CONCLUSIONS OF LAW

1. The Court has jurisdiction of the parties and the subject matter.

2. Libellant is entitled to recover the sum of $232, representing maintenance for the period April 29, 1959, to May 28, 1959.